FILED

10  4 24 PM '05

CLERK ___ ___ ___
WEST__ ___ ___ ___AS

BY_____ ___ ___TY

| | | |
|---|---|---|
| ALAN BROWN, | § | |
| JEAN BROWN, | § | |
| JAY NORTON, and | § | |
| THE LAW OFFICE OF BROWN AND NORTON | § | CIVIL ACTION NO. SA-03-CA-0792-RF |
| | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

Alan Brown, Jean Brown, Jay Norton, and the Law Offices of Brown and Norton (collectively, "Plaintiffs") file this First Amended Complaint against the United States of America based on the conduct of its agencies the Internal Revenue Service and the United States Customs Service (hereinafter called "Defendant") and for cause of action would respectfully show as follows:

### I. FEDERAL TORT CLAIMS ACT

1.      This action arises under the Federal Tort Claims Act, which is codified at Title 28 United States Code §§ 2671-2680. This Court is vested with jurisdiction pursuant to Title 28 United States Code § 1346(b).

20-

## II. PARTIES

2.      Plaintiff, Alan Brown ("Brown"), is a criminal defense lawyer, who works and resides in San Antonio, Bexar County, Texas.

3.      Plaintiff, Jean Brown ("Jean Brown"), is a lawyer and the wife of Plaintiff Alan Brown.  She works and resides in San Antonio, Bexar County, Texas.

4.      Plaintiff, Jay Norton ("Norton"), is a criminal defense lawyer, who works and resides in San Antonio, Bexar County, Texas.

5.      Plaintiff, the Law Offices of Brown and Norton, is a partnership formed under the laws of the State of Texas, which operates in San Antonio, Bexar County, Texas.

6.      Defendant, the United States of America, may be served in the following respects:

(a)      The Internal Revenue Service is an agency of the United States of America.  Defendant may be served with citation by serving John Williams, Jr., Chief Counsel, Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, DC 20224 and by serving the Attorney General for the United States of America, Alberto Gonzales, at Main Justice Building, 950 Pennsylvania Avenue NW, Washington DC 20530.

(b)      The United States Customs Service is an agency of the United States of America.  Defendant may be served with citation by serving Alfonso Robles, Esq., Chief Counsel, U.S. Customs Service, Room 4.4.B, 1300 Pennsylvania Avenue, NW, Washington, DC 20001 and by serving the Attorney General for the United States of America, Alberto Gonzales, at Main Justice Building, 950 Pennsylvania Avenue NW, Washington DC 20530.

(c) The United States Department of Justice is an agency of the United States of America. Defendant may be served with citation by serving the Attorney General for the United States of America, Alberto Gonzales, at Main Justice Building, 950 Pennsylvania Avenue NW, Washington DC 20530.

## III. JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to the United States Constitution, Article 3, Section 2, Clause 1.

8. Venue is proper in the United States District Court for the Western District of Texas, San Antonio Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2) for the reason that all or a substantial part of the acts or omissions giving rise to the cause of action occurred in Bexar County, Texas, which is in the jurisdictional district of this Court pursuant to 28 U.S.C. § 124(d)(5).

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDY

9. Plaintiffs served administrative demands on the Government on August 21, 2002, and supplemental demands on or by March 31, 2005. Plaintiffs' administrative demands were accomplished prior to the expiration of any limitations period. The various agencies upon which demands were made either failed to respond or expressly denied such demands. As a result, Plaintiffs have exhausted their administrative remedies.

10. The various agencies upon which demands were made either failed to respond or expressly denied such demands. As a result, Plaintiffs have exhausted their administrative remedies.

# V. BACKGROUND

11.     Brown is a sixty-year old attorney certified to practice in the area of criminal law by the Texas Board of Legal Specialization.   For the past thirty-three years, he has enjoyed a successful criminal defense practice in San Antonio, Texas, never having been disciplined by the State Bar of Texas.   Brown's firm is devoted entirely to criminal defense work.   Jay Norton ("Norton") is Brown's partner in the law firm of Brown and Norton and also has never been disciplined by the State Bar of Texas.   Jean Brown, Brown's wife, is also a successful attorney who has never been disciplined by the State Bar of Texas.

## *The Sam Naranjo Drug Investigation*

12.     In approximately 1997, various agencies of the Government commenced an investigation into Sam Naranjo ("Naranjo Investigation"), who was a known leader of a gang involved in drug trafficking, money laundering and murder.   The "High Intensity Drug Enforcement Task Force" ("HIDTA"), a group charged with investigating drug and money laundering crimes, which included agents from U.S. Customs Service (Special Agent Lonnie Wiemers), the IRS (Special Agent James Maxwell), the DEA, and the FBI, was assigned to the case.

13.     Although a team of agents worked on the Naranjo Investigation, Wiemers was the *de facto* lead agent.

14.     The lead prosecutor from the local U.S. Attorneys' Office was a well-respected senior prosecutor — Tom McHugh ("McHugh").

15.     Although the case agents involved in the Naranjo Investigation had more than sufficient evidence against Naranjo to indict him in 1997, they obtained a Title III wiretap to obtain evidence regarding other members of his Organization.

16.     During the course of their investigation, the HIDTA case agents learned that the Naranjo Organization was involved in large scale drug trafficking, money laundering, and murder.

*Houston's Criminal Conduct*

17.     Wiemers, Maxwell, and the other agents also began to focus their investigation on Kelly Houston ("Houston") who worked as the office manager and secretary in Brown's law office.

18.     Houston worked in Brown's office since the early 1980s in the capacity of receptionist, then secretary, and eventually as office manager.  Because of her long tenure, Brown had given Houston significant control over the firm's finances, including the receipt, control and recording of monies, and deposit of receipts.

19.     Unbeknownst to Brown, Houston, (who was married with children at the time) had become romantically involved with Naranjo.  Houston's relationship with Naranjo transcended a typical "romance" and found her almost obsessively interested in assisting Naranjo at the expense of her family and friends, who at the time included her employers — Brown and Norton.

20.     As a result of Brown's reputation in the community and Houston's fifteen-year service as his secretary, Houston gained access to information and resources not commonly available to criminals.  These tools made her "attractive" to Naranjo.  As a result, once Naranjo cultivated Houston's obsession, she became a very capable lieutenant in the Naranjo Organization.

21.     Houston's obsession for Naranjo, caused her to engage in numerous crimes in assisting Naranjo's Organization, including, *inter alia*, laundering approximately $50,000 through Brown's law firm trust account (for which the agents implored AUSA McHugh to indict her), obtaining cell phones in her name for Naranjo's use, and theft (hundreds of thousands of dollars from the Law Office of Brown and Norton).

22.     Houston was also able to, *inter alia*: (i) illegally obtain information regarding plea agreements and determine who was cooperating with the Government; (ii) illegally obtain criminal histories and outstanding warrants; (iii) forge bail bonds; (iv) perform title transfers; and otherwise (v) personally assist with the Naranjo Organization's business, finances, and operations.

23.     In essence, although Houston was covertly using Brown's law office as a front for Naranjo's trafficking and money laundering activities, it was very difficult for Brown to discover her actions because she had been a trusted employee for so long, had significant responsibility of the law firm's finances and other business, and had never behaved in such a manner before.

24.     Due to the fact that Houston's criminal activities occurred during her tenure as office manager in Brown's law office, the Naranjo grand jury investigation focused on Houston's work activities and, correspondingly, the Law Office or Brown and Norton.

25.     In February 1998, agents executed a search warrant on Houston's home and seized documents confirming her participation in criminal activity.  In October 1998, AUSA McHugh and Brown each wrote letters to Houston requesting that she return to Brown all law firm records in her possession.  Houston wrote back to AUSA McHugh stating that she did not have any of Brown's documents.  This later proved to be a lie, when she later gave Maxwell at least seven receipt books that had been stolen from Brown's office.

26. Despite compelling evidence of Houston's illegal conduct, AUSA McHugh decided to not seek an indictment against her. Angered by this decision, Maxwell and other case agents challenged AUSA McHugh's decision to his supervisors, but no indictment was ever returned.

27. During the course of the Naranjo Investigation, the agents also learned that Naranjo, Houston, and others had been involved in the murder of a local jockey.

*Although The Agents Seek Brown's Cooperation, They Secretly Begin To Investigate Him*

28. McHugh and the Naranjo agents came to understand that Brown was completely unaware of Houston's illicit conduct because of her unsupervised control of the law firm's business.

29. In September 1997, the Naranjo agents entered Brown's law office to serve him with statutory notice of a Title III wire intercept conducted on his former client — Naranjo.

30. Agents informed Brown that Naranjo was the subject of an investigation and that Houston was involved in a romantic affair with Naranjo and had secretly used the law office to launder Naranjo's illegal drug proceeds.

31. In the Fall of 1997, Houston quit working for the law office after Brown confronted her about her relationship with Naranjo, her theft of money, and the fact she no longer would control the office's money. Unbeknownst to Brown at the time, Houston stole the firm's receipt books when she left.

*Brown's Cooperation with Agents*

32. In response to the Government's request in September 1997, Brown immediately began cooperating with AUSA McHugh and federal agents, including Wiemers and Maxwell,

regarding Houston's money laundering activities and other Houston-related activities relative to the Naranjo Organization.

33.    Brown eventually received a letter from AUSA McHugh indicating that Brown was neither a target nor subject of the investigation. The "no target" letter was delivered on April 6, 1998, long after Brown and his office had provided substantial cooperation. The Government requested an independent audit of Brown's firm on the premise that it was needed to track monies secretly laundered and/or stolen by Houston. Brown agreed to the audit because he learned of Houston's illegal use of his accounts and thefts. The results of the audit were eventually provided to the Government.

34.    Brown's cooperation lasted through the date search warrants were executed at his office and home in August 2000. During this three-year period, Brown provided complete cooperation to the prosecutor and agents. Brown's employees met many times with Maxwell, and carefully explained the firm's financial procedures to him. They explained how money receipts were recorded, how and when deposits were made, where fee and other financial information were recorded, and many other aspects of the firm's financial procedures.

35.    Per Brown's instructions, the firm provided Maxwell extensive access to the law firm's financial records. Through this process, Maxwell learned that Brown never participated in the firm's financial procedures, and left them entirely in Houston's control.

*Brown Assists In The Naranjo/Houston Investigation And Naranjo Threatens To Kill Him*

36.    In February 1999, Brown agreed to testify before a grand jury investigating Houston and Naranjo. Subsequently, Brown was publicly identified as a prosecution witness to Naranjo's defense team prior to trial.

37.     AUSA McHugh later described Brown's cooperation as "unqualified, unconditional," and Brown became the "critical" witness in the investigation of Houston.

38.     Brown learned from the Naranjo case agents that Naranjo ordered that Brown be murdered in retaliation for his cooperation in the case against him and Houston.

*The Agents Use Brown's Cooperation To Motivate Houston To "Testify" Against Him*

39.     Upon information and belief, beginning in 1997, Agent Wiemers, Agent Maxwell and others began trying to find evidence that Brown was either a member of the Naranjo conspiracy or somehow subject to prosecution. The possible explanation for the agents long-standing quest to "pin" any charge possible on Brown range from the "Trophy Buck" theory to outright payback for his long-standing criminal defense practice, which frequently pitted him against agents of the Government.

40.     Yet, the Naranjo investigation failed to uncover any criminal activity by Brown. Not only did the Government use Brown as a witness against Naranjo and Houston, AUSA McHugh has testified that he did not believe Brown had committed any crime.

41.     Houston had been given ample opportunities to assist the Government in the investigation of Naranjo's true crimes, and steadfastly declined to assist in the Government's case against Naranjo.

42.     Yet, once Houston learned that Brown had cooperated in the Naranjo investigation, she began to cooperate with Maxwell and Wiemers in attempting to start a case against Brown as a means to "pay him back." Indeed, it should have been no surprise to anyone involved that given Naranjo's death threat, the desire to manufacture evidence against Brown certainly was not beyond the realm of contemplation.

*AUSA McHugh Rejects Naranjo And Houston's Offer To Cooperate Against Brown*

43.     AUSA McHugh wisely rejected Naranjo and Houston's offer to cooperate against Brown because, based on his knowledge of the case and the background, he concluded Houston and Naranjo were not credible.

44.     After Naranjo's cooperation was rejected, he went to trial, pleaded guilty after two days, and received an 18-year sentence for violations of the Drug Kingpin Act (also known as conducting a continuing criminal enterprise).

45.     Then, the agents (led by Wiemers and Maxwell) who had been working the Brown investigation, on their own without McHugh's knowledge and in spite of McHugh's rejection of the case, began using Houston's help to prosecute Brown.

46.     In blindly utilizing Houston's "cooperation," the agent's ignored the fact that during her period of "non-cooperation," Houston actively lied to agents (including Agent Wiemers) regarding the existence of key pieces of evidence that now allegedly form the case against Brown. Houston and Naranjo's "cooperation," which was motivated by revenge more than anything else, comprise almost the entire case against Brown.

*The Agents Utilize Houston's "Cooperation" To Further Their Own Case Against Brown*

47.     After AUSA McHugh declined to indict Houston, and rejected her offer to cooperate against Brown, the agents nonetheless accepted her cooperation and she made allegations against Brown.  These were the same agents with whom Brown thought he was cooperating.  AUSA McHugh counseled Maxwell about Houston's lack of credibility and her dangerous and highly suspect motivation against Brown.

48.     Agent Wiemers and Agent Maxwell personally cultivated Houston as a witness against Brown despite admonishments from AUSA McHugh.  In attempting to build a tax case against Brown, Agent Wiemers, who had no authority to investigate a tax case, and Agent Maxwell ignored the fact that Houston was motivated to "assist" them for at least four reasons: (i) revenge against Brown for his cooperation against her and her lover Naranjo; (ii) the hope of reducing Naranjo's sentence; (iii) self-preservation (because the investigation against her remained pending); and (iv) Houston's persistent desire to sidetrack the agents from continuing their investigation against the remaining members of the Naranjo Organization, including Naranjo's brothers (who were engaged in numerous ongoing crimes, including drug trafficking and murder).

49.     But, Agent Wiemers and Agent Maxwell ignored all of this and, for some unexplained reason adopted Houston as the principal witness in the Brown investigation despite her open hatred for Brown and her well-recognized personal interest in seeing that he be "paid back."

50.     Despite knowing that Houston (i) was the office manager in Brown's law office, (ii) had exclusive control of Brown's law office monies, the office's record keeping process and dealings with the accountants, (iii) had laundered money for the Naranjo Organization through the firm's accounts and stolen hundreds of thousands of dollars from Brown's law office, the agents unconditionally accepted as Gospel Houston's allegations that Brown had failed to pay his taxes.

*The Naranjo Case Agents "Shop" The Brown Case To Washington With The Enticement Of Allegations Of Public Corruption*

51.     Despite the obvious unfairness of allowing Houston to "get back" at Brown for his cooperation with the Government, the agents in the case (especially Agent Wiemers) ignored

rejections from several prosecutors in the San Antonio U.S. Attorney's Office and "shopped" the case to "main Justice" prosecutors at the Department of Justice ("DOJ") in Washington based upon the uncorroborated statements of Houston regarding unreported taxable income and, more importantly, Brown's alleged involvement in activities constituting public corruption. Even though Brown and his office had been extremely cooperative during the Naranjo investigation and had never refused a prior request for information, the agents nevertheless sought and obtained a federal search warrant on August 22, 2000, for the personal residence of Alan Brown and the Law Offices of Brown and Norton.

52.     The agents realized that they did not have evidence of tax evasion apart from Houston's word. During the next fourteen months (through the date that search warrants were executed on Brown's home and office), Houston covertly met with Maxwell and other agents *over fifty times* to implicate Brown in a purported scheme to evade taxes, and gave agents the law firm's receipt books. Yet, Maxwell had information that she had stolen and previously lied about possessing evidence.

53.     At no time during this period of Houston's cooperation was Brown aware that she was making false allegations about him. Maxwell and others covertly investigated Brown, even though Brown continued to provide these same agents information concerning Houston and her suspected illegal acts with non-indicted members of Naranjo's gang, as well as continued access to the firm's financial records.

54.     Agent Wiemers took the lead role in gathering and cultivating Houston as a resource in the ongoing Brown investigation. Of course, U.S. Customs Agents generally have no

authority to conduct tax investigations. The agents, however, were seeking "payback" against Brown for his years of combat against them as a criminal defense lawyer.

*The August 2000 Search Warrants*

55.    On the night of August 22, 2000, IRS agents executed search warrants on Brown's law office and home. The warrants were obtained pursuant to an affidavit prepared and sworn to by IRS Special Agent James Maxwell, alleging that probable cause existed to believe Brown had under-reported income on his tax returns.

56.    Tax returns and other financial documents later provided to the court, however, proved Brown paid hundreds of thousands of dollars in taxes during the time period covered by the search warrants and had committed no crime. Key documents and facts used by Maxwell to support his allegations in fact prove that Brown did not evade the payment of taxes.

57.    Maxwell's reliance on Houston's testimony that Brown had evaded taxes was accompanied by misrepresentations and bad faith. As further explained below, the Government's allegation that Brown committed "massive" tax evasion is patently false. Yet, these search warrants occurred long after this saga began.

58.    Upon information and belief, Maxwell and his fellow agents lied and/or intentionally/maliciously omitted and withheld material information from the DOJ (in seeking permission to apply for a search warrant) and to the Federal Magistrate Judge (in obtaining the search warrant).

59.    Further, the agents lied and/or intentionally omitted and withheld material information and lacked reasonable suspicion to institute a grand jury investigation, which has continued for over two years.

*Brown Seeks To Have The Search Warrants Thrown Out In Rule 41 Proceedings*

60.     Brown, his partner Norton, and his law office in their own stead and on behalf of the firm's clients, filed a Motion for Return of Seized Property under Rule 41. Brown challenged the warrants for lack of probable cause, the overbreadth of requested documents, and the agents' misconduct in the investigation and warrant execution.

61.     The district court issued a 20-page ruling granting a hearing, finding there were potentially irreparable consequences, and unsealing the search warrant affidavit. After the affidavit was unsealed, it became apparent that Maxwell (the affiant) intentionally and artfully misrepresented significant facts and omitted critical information.

62.     In August 2001, the district court held a three-day hearing on the Rule 41 Motion.

*In August 2001, The Case Agents Lie To The Press That They Have Plenty Of Evidence Against Brown, But The District Court Has Stalled Their Investigation*

63.     In August 2001, the agents conducting the Brown grand jury investigation intentionally and maliciously leaked information regarding their "investigation" to the press. The information that was leaked to the press was designed and calculated to injure Brown, his business, his family, and his personal and professional reputation.

64.     Grand jury proceedings are secret in general, and even more so when they are tax-related. The agents' conduct was a clear violation of agency rules and Judge Garcia's standing orders in the case. The article, which appeared on the front page of the Friday, August 16, 2002 issue of the San Antonio Express News, in essence stated that Brown was guilty and that the investigation was proceeding along "fine," until Judge Garcia began his Rule 41 inquiry.

65.      Although Brown had not refused one request for financial records or non-privileged information, agents sought and obtained search warrants for Brown's office and home. As noted in the Maxwell affidavit, Houston purportedly said that Brown received income that was not reported on his income tax returns. The only tangible "evidence" that Maxwell used to corroborate Houston's allegations came from the firm's receipt books. As was demonstrated to the district court, Maxwell mischaracterized the receipt books to support his specious allegations of tax evasion.

66.      Maxwell swore that the "income" reflected in the firm's receipt books exceeded the amount of gross income on Brown's federal tax returns. Remarkably, Maxwell failed to state in his affidavit that he included *non*-taxable receipts in his calculation of taxable income. The district court ultimately found Maxwell's statement was a gross misrepresentation of the truth.

67.      The court also found that Maxwell made false statements and omitted material information regarding Houston's credibility and her involvement in criminal activity. Additionally, the court found compelling the fact that Maxwell concealed from the Magistrate Judge that Houston laundered drug proceeds through *the very same account* that Maxwell alleged Brown was using to evade taxes.

68.      Maxwell omitted any reference to the powerful motivations Houston had to lie about Brown. Despite having reliable evidence that Houston had exclusive control of the law firm's finances, had secretly laundered a gang's drug proceeds through the firm's accounts, had lied to a prosecutor and agents, and had significant motives to "pay back" Brown, Maxwell created the false impression that she was reliable and credible.

*The District Court's Rejection Of Maxwell's Affidavit*

69.     The district court found that Maxwell "displayed callous disregard for Brown's *constitutional rights* by recklessly or intentionally withholding critical information from the Magistrate Judge and by including untruthful information in his affidavit." The court found that had Maxwell "not done so, he would have had no probable cause for the search, and hence, no materials to seize." Further, the court found that "the government's conduct [was] sufficiently reprehensible to deny it the use of the materials it illegally seized."

70.     The court observed that it "ha[d] only rarely granted a motion to suppress," but never had these unique facts been presented. After having heard Maxwell's explanations, evaluating his demeanor and credibility, and considering all of the evidence the court found Maxwell's conduct was "sufficiently reprehensible" that complete return of all originals and copies of seized documents was warranted.

*The Ongoing Grand Jury Investigation*

71.     Meanwhile, once the agents working on the case realized that they could suffer personal harm (in the form of reprimands, suspension, or termination) as a result of their problematic search warrant and shoddy investigation, things became "personal." The agents embarked on a "take no prisoners" approach designed to obtain an indictment against Brown regardless of the facts, the law or Plaintiffs' constitutional rights.

72.     During the Fall 2000 to Spring 2003 time frame, the agents spent countless hours seeking information from many acquaintance, merchant, and family member of Brown's seeking to support Houston's unsubstantiated allegations.

73.     During this two and one-half year time period, the agents served grand jury subpoenas on Brown's eighty-year old parents, his two grown daughters who lived out of State, his former wife, and countless others.

74.     Additionally, just prior to the holiday season each year, the agents would serve a barrage of subpoenas just in order to further subject Brown to harassment and additional constitutional injuries.

75.     The only "probable cause" to support the grand jury investigation was the same evidence that had been rejected by the district court in connection with the search warrant challenge — namely Houston's word.

*The Government Indicts Alan Brown And Jean Brown For Tax Evasion*

76.     Despite Judge Garza's ruling, and its specific references to the government's lack of evidence regarding any wrongdoing by Brown, the Government pushed forward with the investigation and prosecution of Brown for tax evasion. The agents involved in the case and prosecutors Brenda K. Morris and Peter Ainsworth worked tirelessly to uncover some basis upon which to prosecute Brown, and ultimately prosecuted him for alleged tax evasion. Upon information and belief, prosecutors were motivated primarily by a desire to uncover evidence of Brown's involvement in alleged public corruption or otherwise pressure him into testifying against other alleged offenders.

77.     After two and one-half years of pure harassment and numerous constitutional violations, the agents, along with their DOJ attorneys, sought and obtained a three-count indictment naming both Alan and Jean Brown for tax evasion on April 2, 2003. Of course, Brown's wife, Jean Brown had absolutely no involvement in any tax evasion, she was added

simply as one more "cheap shot" and for additional leverage against Brown to induce his cooperation for the prosecutors' personal war against fictitious public corruption.

78.     However, a cursory analysis of the situation at the time of the indictment discloses that the plan (to indict Alan Brown and his wife to force his cooperation) had virtually no legal viability. By the time of the indictment, the investigation of Alan and Jean Brown had gone on for so long and had been so well publicized that any resulting corruption case would have been, by necessity, a "historical" case because no judicial official (had there been one in the first place) would have continued to accept bribes from a man under such intense public scrutiny.

79.     In spite of the allegations contained in the indictment, each year during the 1990's, the Browns paid hundreds of thousands of dollars in tax on hundreds of thousands of dollars in reported income.

80.     Meanwhile, federal agents James Maxwell and Tom Guiterrez knew that no public corruption case existed against Brown. So, instead of abandoning the chase, Maxwell and Guiterrez continued their plight by using unsupportable allegations of public corruption made by Houston and Sean Tompkins, a former vendor of bail bonds who frequently had contact with Brown's law office. These baseless statements allege that Brown maintained improper relationships with numerous state and federal judges in San Antonio and even paid bribes to them. Unable to corroborate these allegations, the federal agents again chose to continue the witch-hunt by, upon information and belief, manufacturing evidence of public corruption through the addition of fictitious statements to otherwise non-incriminating Memorandums of Interview ("MOI")— specifically the Crystal Brooks MOI.

81.     Evidence suggests that prior to the return of the indictment, prosecutor Brenda Morris knew that the Brooks MOI contained blatant fabrications. For example, in the grand jury testimony of Crystal Brooks, given one month before the indictment, prosecutor Morris did not even ask *a single question* about Ms. Brooks' MOI that alleged Brown's potential involvement in public corruption.

82.     Despite the lack of grounds to support prosecuting Brown for public corruption, government prosecutors Brenda Morris and Peter Ainsworth expressly acknowledged the vexatious, frivolous, and bad faith nature of their prosecution of Brown for tax evasion to attorneys for both Alan and Jean Brown. On or around April of 2003, Brenda K. Morris informed Joseph A. Turner, then attorney for Jean Brown, that the case against her husband was about public corruption—not tax evasion—and that Brown would have to debrief the government regarding such public corruption if he wanted their pursuit to come to an end. Specifically, Brenda K. Morris proclaimed to Mr. Turner "[p]ut your ear to the phone. I don't give a rat's ass about Alan Brown's taxes. This case is about public corruption."

83.     This ulterior motivation was reinforced when Government prosecutor Peter Ainsworth responded to inquiries by Michael W. McCrum, one of Brown's attorneys, regarding the nature of the government's investigation and prosecution of Brown by explaining that he "couldn't care less about Alan Brown's taxes," and that this prosecution was not about Brown's taxes, but was instead about the government's desire to speak with Brown about public corruption.

*The Government Prosecutes Alan Brown For Tax Evasion*

84.     The Government's frivolous and malicious prosecution of Brown for tax evasion resulted in a lengthy and costly trial.

85.     At Brown's tax evasion trial, the prosecutors failed to prove that Brown or his wife Jean Brown had made expenditures exceeding the income reported on their tax returns, that they were hiding large amounts of cash from the I.R.S., or put forth any other evidence required to prove tax evasion. Disturbingly, this was an outcome the prosecutors anticipated prior to the trial—yet the prosecutors did nothing to halt their malicious prosecution or mitigate the disastrous effects of their callous actions.

86.     As a result, Brown was acquitted on February 9, 2005 of all tax evasion charges following a 29-day jury trial and less than one hour of jury deliberations. But this did not end prosecutor Brenda Morris' needless and incessant torture of the Brown family's life, businesses, or general well being.

87.     Despite Brown's acquittal, prosecutors relentlessly pursued the malicious and absolutely frivolous prosecution of Jean Brown for nearly two full months. Prosecutors ignored weekly pleas to dismiss the case until the investigation against Jean Brown was dismissed without formal prosecution on April 6, 2005—*58 days after her husband's acquittal.*

88.     The prosecutor's persistent investigation of baseless claims against Jean Brown served no purpose but (i) as leverage in an attempt to coerce Brown to cooperate with the prosecutors' frenzied and delusional personal war against apparitional public corruption, and (ii) as abusive harassment to further multiply the economic and non-economic damages of both Alan and Jean Brown.

*Houston And Naranjo Were Involved In The Murder Of A San Antonio Jockey*

89.     Perhaps, most egregiously, during the course of the Naranjo investigation, Wiemers and Maxwell learned of several significant criminal acts that had been committed by Naranjo and

his brothers, whose organization remains intact and viable to this day. First, Wiemers and Maxwell learned about a murder of a San Antonio jockey by Naranjo and others, including the fact that Houston had assisted with the cover up.

90.     Upon information and belief, the Bexar County District Attorney's Office commenced a Grand Jury investigation into the murder case and Houston's involvement. Yet, Wiemers, Maxwell, prosecutors, and others requested that the D.A.'s office refrain from pursuing the case for fear that if Houston was indicted that it could undermine their case against Brown.

91.     Not only did Wiemers, Maxwell, and prosecutors do nothing to pursue the murder investigation or the ongoing drug trafficking, but they also remained devoted to the investigation and prosecution of Alan and Jean Brown. Moreover, to the extent that the Naranjo Organization still thrives, and Houston is still assisting it, the agents' orchestration of this tax indictment with Houston as the primary witness is particularly egregious.

## VI. CAUSES OF ACTION

### *Federal Tort Claims Act*

92.     Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs of this Complaint, as if set forth in full here.

93.     The agents and any other persons responsible for the acts against Plaintiffs were "investigative or law enforcement officer[s]" of the defendant United States of America within the meaning of 28 U.S.C. § 2680(h) and acted within the scope of their employment when they: (i) authorized and obtained the search warrant used to search Brown's home and law office; (ii) conducted the ensuing grand jury investigation; and (iii) improperly secured the indictments of Alan and Jean Brown.

94.     The Maxwell Affidavit in support of the search warrant for the search of the Law Offices of Brown and Norton and Brown's home was not a valid warrant for the search of Plaintiffs' offices, records, or home.

95.     The agents authorized a warrantless search of Plaintiffs' offices, records, and home that was without probable cause to believe that Plaintiffs had engaged in any criminal activity. Such action was unreasonable and violated 21 U.S.C. § 878(a)(3), as well as Plaintiff's clearly established rights under the Fourth Amendment to the United States Constitution to be free from a warrantless search.

96.     Furthermore, the "investigative or law enforcement officers" of the defendant United States of America knew of or should have known that causing warrantless search would violate Plaintiffs' constitutional rights.

97.     Defendants and/or other "investigative or law enforcement officers" used false and/or misleading evidence to obtain the search warrant, justify the grand jury investigation, and ultimately the indictments of Alan and Jean Brown, all of which created a substantial likelihood of injury to Plaintiffs.

98.     The agents' willful authorization of the search warrants without probable cause, their post-search grand jury investigation based on the same baseless evidence, and their indictments constitute unreasonable conduct and violated Plaintiffs' clearly established rights under the Fourth Amendment to the United States Constitution to be free from an unreasonable search and seizure and the Fifth Amendment to Due Process of Law.

99.	Furthermore, the agents in this case responsible for the Brown investigation violated numerous Constitutional Rules, Internal Policy Rules, and knew or should have known that their conduct and omissions would violate Plaintiffs' rights.

100.	The "investigative or law enforcement officers" responsible for the investigation of the case against Alan and Jean Brown had a continuing, nondiscretionary duty to act in accordance with their own internal policies and procedures, as well as in accordance with the Due Process Clause of the Fifth Amendment to the United States Constitution.

101.	The "investigative or law enforcement officers'" personal motivation to search, investigate and indict Alan and Jean Brown at all costs, constitutes an intentional breach of their continuing, nondiscretionary duty toward Plaintiffs, and proximately caused Plaintiffs to suffer significant damages.

102.	The above described acts and omissions by "investigative or law enforcement officers" of the defendant United States of America in connection with the search, investigation, and indictment constitutes an invasion of privacy, intentional infliction of emotional distress, trespass, malicious prosecution, abuse of process, and negligence, all in violation of the substantive law of the State of Texas.	Therefore, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, the defendant United States of America is liable to Plaintiffs for actual damages proximately cause by each of these actionable, state-law torts.

103.	Defendant, through its "investigative or law enforcement officers" made an illegal, improper, perverted use of the process.	In doing so, the officers had an ulterior motive or purpose in exercising such illegal, improper, perverted use of the process.	Plaintiffs have been damaged thereby.

104. Additionally, Defendant, through its "investigative or law enforcement officers," maliciously commenced a criminal prosecution against Alan and Jean Brown without probable cause, which proximately caused Plaintiffs to suffer significant damages.

105. Finally, Defendant, through its "investigative or law enforcement officers," maliciously prosecuted Alan Brown through and including a lengthy criminal trial without probable cause, which proximately caused Plaintiffs to suffer significant damages.

106. As discussed above, Plaintiffs have satisfied all procedural and administrative requirements set forth in the FTCA. In particular, Plaintiffs timely filed an administrative claim against the defendant United States of America with the IRS, U.S. Customs, the DEA, and the Attorney General. These claims were deemed denied. As a result, suit is now proper within the meaning of 28 U.S.C. § 2675(a).

107. Plaintiffs now sue for all damages proximately caused by Defendant's wrongful conduct.

**WHEREFORE PREMISES CONSIDERED**, Plaintiffs respectfully request that the United States of America be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in Plaintiffs' favor against the United States of America for the following:

a. actual, compensatory, consequential, and all other damages in an amount determined by this Court;

b. pre-judgment and post-judgment interest at the highest rate allowed by law;

c. attorneys' fees;

d. costs of court; and

e. all such further relief to which the Plaintiffs are entitled at law and in equity.

Respectfully submitted,

William T. Reid, IV
Texas State Bar No. 00788817
P. Jason Collins
Texas State Bar No. 24040711
DIAMOND MCCARTHY TAYLOR
FINLEY BRYANT & LEE, L.L.P.
6504 Bridgepoint Parkway, Suite 400
Austin, TX 78730
512/617-5200 (phone)
512/617-5299 (fax)

**ATTORNEYS FOR ALAN BROWN, JEAN BROWN,
JAY NORTON, AND THE LAW OFFICES OF BROWN
AND NORTON**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the following counsel by certified mail, return receipt requested on June 10, 2005:

Kurt J. Bohn
Special Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, CO 80202

P. Jason Collins